UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANGELIKA NABI,

      Plaintiff,

                                    Case No. 23-cv-00844

v.


PROVIDENT LIFE AND CASUALTY
INSURANCE COMPANY,

      Defendant.

---

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Daniel J. Brady, Esq.
Michael A. Brady, Esq.
HAGERTY & BRADY
Attorneys for Plaintiff
69 Delaware Avenue,
Suite 1010
Buffalo, NY 14202
(716) 856-9443

Plaintiff Angelika Nabi ("Plaintiff" or "Ms. Nabi") filed this lawsuit under ERISA § 502(a)(1)(B) to recover long-term disability benefits from Defendant Provident Life and Casualty Insurance Company ("Defendant" or "Provident"). The parties moved for summary judgment, which the Court denied, finding an issue of fact as to the cognitive condition of Plaintiff as of December 2009.

In its decision denying summary judgment, the Court did make a number of factual findings and legal conclusions which were not at issue at trial. This submission will not belabor those findings and conclusions, but several are nonetheless relevant as the trial testimony did elucidate several aspects of how Plaintiff's claim was handled.

This Court found that "procedural irregularities call into question the fairness and clarity of the decision-making process as to Nabi's claim." *Nabi v. Provident Life and Casualty Insurance Co.*, 789 F. Supp. 3d 277, 288 (W.D.N.Y. 2025). Specifically, the Court found, among other things: that Provident internally indicated, prior to receiving any medical records, an intent to deny Ms. Nabi's claim; that Provident was well aware during the administrative process that Ms. Nabi was claiming a total disability date of December 2009; and that an in-house attorney at Provident directed claims personnel to consider

1

Ms. Nabi's claim by a standard of "legal incapacity and guardianship," a higher bar than was in the Policy. *Id.*

On December 3, 2025, the Court held a daylong bench trial on the specific issue of fact identified by the Court, hearing testimony from two physician witnesses.

Following the bench trial before this Court, the Court instructed the parties to submit their proposed findings of fact and conclusions of law. Plaintiff respectfully requests that the Court make the following findings of fact and conclusions of law and enter judgment in Plaintiff's favor.

### Plaintiff's Expert, Dr. Gregory J. Castiglia

1.    Plaintiff introduced testimony from Gregory J. Castiglia, M.D., whose qualifications and expertise are discussed below.

2.    Dr. Castiglia is a board-certified neurosurgeon with the State University of New York at Buffalo Department of Neurosurgery. Trial Tr. at 5-6.

3.    Dr. Castiglia graduated from Dartmouth College in 1988 and received his MD from Columbia University in 1992. Trial Tr. at 6. He completed a residency in neurosurgery at the State University of New York at Buffalo in 1999 and has been a practicing neurosurgeon in the Buffalo area since that time. Trial Tr. at 6-7.

4.      Dr. Castiglia has held leadership roles as the Chief of Neurosurgery at Erie County Medical Center and President of Medical Staff at Sisters Hospital and is currently Chief of Neurosurgery at Sisters Hospital.  Trial Tr. at 5-6.

5.      He also serves as an assistant professor of neurosurgery at the University at Buffalo Medical School, where he trains medical students and residents. Trial Tr. at 8.

6.      Dr. Castiglia performs approximately 500 surgeries per year, including approximately 100 brain surgeries per year.  He estimates that about one third of the brain surgeries he performs are for brain tumors. Trial Tr. at 9.

7.      Dr. Castiglia has experience treating a variety of brain tumors, including primary nerve cell tumors, tumors of the lining of the ventricles, and glial cell tumors.  Glial cell tumors are graded 1, 2, 3, or 4, depending on the aggressiveness of the tumor.  The most aggressive form is called a glioblastoma multiforme, which is a grade 4.  Trial Tr. at 9.

8.      A patient who receives a diagnosis of glioblastoma multiforme typically has a survival expectancy of only 6 to 12 months without treatment. Trial Tr. at 9-10.  With aggressive treatment, survival of two to three years from the date of diagnosis is considered a good outcome for a patient with glioblastoma multiforme. Trial Tr. at 11.

9.    A combination of treatments is used to treat glioblastoma multiforme.    The first treatment is surgical resection of the tumor. Glioblastomas are often referred to as spider tumors or spider webs, because they send microscopic extensions into the surrounding tissue.  As a result, even if all visible parts of the tumor are removed, there typically will remain cancer cells outside of the surgical field that cannot be removed.  Trial Tr. at 10.

10.    Following surgery, chemotherapy and radiation of the brain are used to slow the expansion of these remaining tumor cells. Trial Tr. at 10.

11.    Angelika Nabi presented to Dr. Castiglia in 2003 with a seizure. Scans showed a lesion in her brain's right temporal lobe, and a biopsy was done which came back with a diagnosis of glioblastoma.  Dr. Castiglia noted that because Ms. Nabi presented with a seizure, her glioblastoma multiforme was diagnosed early. Trial Tr. at 13.

12.    At the time of her diagnosis, Angelika Nabi was 51, had two sons at home, including one with a developmental delay who required care. She also was the officer manager of a medical practice.  Trial Tr. at 13.

13.    At the time of her diagnosis in 2003, Ms. Nabi was informed by her doctors that she had only 9-12 months to live. Trial Tr. at 13.

14.    Dr. Castiglia performed surgery on Ms. Nabi on an urgent basis to remove the cancerous tissue from her brain. Trial Tr. at 16.   Dr. Castiglia

believed it was unlikely that all of the cancer cells were removed during that surgery, and so, as is typical for treatment of glioblastoma multiforme, chemotherapy and radiation treatments were administered to Ms. Nabi following the surgery. Trial Tr. at 16, 10.

15.    Radiation therapy treats cancer by exploiting the rapid division (and thus rapid growth) of tumor cells. In order to divide and grow more tumor cells, the DNA inside the nucleus of a tumor cell will replicate itself and separate to form a new DNA strand in the new, neighboring cell. As tumors grow exponentially as a result of this process, they cause problems in terms of mass effect, and in brain cancers, they affect healthy brain tissue. Radiation is used because it effectively prevents the DNA replication step from taking place in the tumor cells, thus halting the growth of the tumor. Trial Tr. at 18.

16.    Unfortunately, the brain is extremely sensitive to radiation. Dr. Castiglia described radiation as "a double-edged sword" because although it can halt or even eradicate tumor cells, it can cause damage to healthy brain cells as well, resulting in mental status changes and even blindness. Trial Tr. 17, 18.

17.    The same radiation treatment that can halt the growth of tumor cells can damage healthy cells that are nearby. Vascular cells that provide oxygenated blood from the heart to the brain can stop dividing as a result of the radiation, leading to necrosis in the brain. The effects of radiation damage to healthy cells

happens at a slower rate than the radiation damage to cancer cells, which are characterized by rapid growth. As a result, the adverse effects of radiation on the brain typically take months or years to manifest following completion of the radiation. Trial Tr. at 19.

18.    Because these adverse effects of radiation take so long to manifest, those side effects are not a primary focus during treatment of patients with glioblastoma, as patients typically die well before the effects of radiation treatments appear. Trial Tr. at 20.

19.    Angelika Nabi received a large dose of whole brain radiation, possibly more than 5,000 centigray (the measure of absorbed radiation), which is more than the recommended dose of radiation. Dr. Castiglia explained that the justification for Ms. Nabi's high dose of radiation was "the feeling was that this is a terminal disease." Trial Tr. at 20.

20.    Dr. Castiglia is aware of very few patients with glioblastoma multiforme who have survived more than two decades from the date of diagnosis. Trial Tr. at 22.

21.    Angelika Nabi is one of those very few patients. She has not had a recurrence of glioblastoma multiforme since her diagnosis 22 years ago. Trial Tr. at 20.

22.    Dr. Castiglia believes the immune response to an infection Ms. Nabi developed may have played a role in her exceptional long-term survival with glioblastoma multiforme. Trial Tr. at 21.

23.    Ms. Nabi has been a patient of Dr. Castiglia's continuously from 2003 to the present. Trial Tr. at 23.

24.    She still sees Dr. Castiglia annually because her glioblastoma multiforme may yet recur.  Trial Tr. 27.

25.    The long-term cognitive function impacts following radiation treatment are a well-known and understood phenomenon in patients who survive for a long period of time after radiation treatment.  Trial Tr. at 27.

26.    Cognitive functional capacity cannot typically be determined on a scan. Trial Tr. at 25.

27.    Partly for that reason, Dr. Castiglia meets personally with his patients for office visits, despite performing approximately 500 surgeries per year and teaching medical school residents.  Trial Tr. at 24.

28.    Dr. Castiglia also has experience with patients who have experienced brain disorders or brain cancers other than glioblastoma multiforme who have developed cognitive function problems while under his care. Trial Tr. at 25.

29.    Dr. Castiglia relies on his personal interactions and discussions with patients as well as his interaction with the patient's family and friends to help him recognize cognitive impairments in his patients.  Trial Tr. at 26.

30.    When Dr. Castiglia is assessing a patient and considering the impact of some kind of cognitive problem, he relies not only on the subjective complaints of the patient in front of him but also on his personal observations of the patient as well as his observations of and experience with the many other patients he has had who have experienced cognitive problems, whether from radiation or as a result of some other brain injury or disorder. Trial Tr. at 25-26.

31.    After Ms. Nabi's initial course of treatment for her glioblastoma multiforme was complete, she saw Dr. Castiglia once every six weeks, then sometime after that, every three months, then after two to three years, every six months with repeat imaging studies, then after several years, once a year.  Trial Tr. at 28.

32.    In the years after Ms. Nabi's 2003 diagnosis of glioblastoma multiforme, Dr. Castiglia began to observe signs in Ms. Nabi of damage done to her brain tissue as a result of radiation necrosis.  Trial Tr. 23.

33.    Radiation necrosis is one of the side effects of receiving radiation treatments in the brain.  The radiation damage to the brain's vascular pathways can cause the blood supply to various areas of the brain to be insufficient to

deliver oxygenated blood to the healthy brain tissues. Areas of the brain that were otherwise healthy then "succumb" or die off as a result of the radiation treatment. Trial Tr. 22.

34.    In 2009, Dr. Castiglia became aware that Ms. Nabi had stopped working as a result of making errors in her tasks at work. Trial Tr. at 28, 29.

35.    Based on Dr. Castiglia's direct observation of her as a patient, he noticed a definite change in Ms. Nabi's level of function, mood, and behavior leading up to the time she stopped working in 2009. Trial Tr. at 30.

36.    Dr. Castiglia observed that during this time Ms. Nabi went from a "lady who was very confident to becoming much more withdrawn over the course of several years of treatment." Trial Tr. at 30.

37.    During that same period of time, Dr. Castiglia observed a change in Ms. Nabi's ability to interact with him at their visits. Trial Tr. at 30.

38.    Based on his interactions with Ms. Nabi and his knowledge of her as a patient, it became evident to Dr. Castiglia that by the time she stopped working in 2009, her cognitive function had been damaged by her radiation treatment to such an extent that "she was not going to be able to continue...going into the office every day, functioning at that level." Trial Tr. at 31.

39.    Dr. Castiglia opined that by the time Angelika Nabi ceased working in 2009, her cognitive function had been impaired as a result of her accumulated whole brain radiation treatments and chemotherapy treatments. Trial Tr. at 38.

40.    Prior to testifying at trial, Dr. Castiglia had not reviewed the Provident insurance policy at issue in this lawsuit.  Upon reviewing it while on the stand, Dr. Castiglia opined that at the time Ms. Nabi stopped working in 2009, it would have been beyond her mental processing ability to read and understand the policy, apply the meaning of it to her own condition, and follow the instructions for filing a notice of claim.  Trial Tr. at 39. Joint Exhibit 2, at ¶¶ 26-28.

41.    Dr. Castiglia testified that he's known Ms. Nabi as a patient for many years and that he knows her very well; he can tell when something is not right with her.  Trial Tr. at 49.

42.    Dr. Castiglia did not send Ms. Nabi for any formal cognitive evaluation or refer her to a neuropsychologist for an evaluation.  Trial Tr. at 49. He saw no need for such an evaluation.  Trial Tr. at 91.

43.    On cross-examination, Dr. Castiglia testified that in his opinion, the cognitive issues resulting from Ms. Nabi's treatment for her brain tumor would have prevented her from calling the person at Provident responsible for receiving a notice of claim in 2009.  Trial Tr. at 83.

44.    When asked to interpret certain portions of the administrative record that included indications suggesting that Ms. Nabi was driving after 2009, including while at the same time that she was confined to a wheelchair, Dr. Castiglia testified that to his recollection, she was unable to stand or ambulate at the time, and he did not believe she was driving.  Trial Tr. at 91.

45.    In forming his opinions, Dr. Castiglia relied on sources and methodologies, such as his many interactions with Ms. Nabi as a patient, his observations of her and his discussions with her and family members, his understanding of the disease process of glioblastoma multiforme, his knowledge of the long-term impacts of whole brain radiation treatment, and his treatment of many other patients who have suffered cognitive disorders or injuries under his care, that he typically employs as a practicing neurosurgeon.

46.    Defendant did not put forward any expert testimony rebutting Dr. Castiglia's opinions.

47.    The Court finds Dr. Castiglia credible, his methodology to be sound, and his conclusions and opinions reliable. Accordingly, the Court credits Dr. Castiglia's testimony, conclusions, and opinions.

### Defendant's Expert, Dr. Judith M. Cohen

48.    Defendant introduced testimony from Judith M. Cohen, M.D., whose qualifications and expertise are discussed below.

11

49.    Dr. Cohen is a medical doctor who is board-certified in family practice. Trial Tr. at 96.

50.    Dr. Cohen graduated from University of Massachusetts Medical School and completed a family practice residency at the same school. Trial Tr. 97.

51.    Dr. Cohen worked in family medicine treating patients for approximately seven years, from 1996 to 2003. Joint Exhibit 4, at 5.

52.    Dr. Cohen testified that during her seven years treating patients as a family medicine physician, ending in 2003, she did not recall ever treating a patient with a diagnosis of glioblastoma multiforme. Trial Tr. 124.

53.    Dr. Cohen left the active practice of medicine over 20 years ago when she began working at Unum[1] in 2003. Trial Tr. 98.

54.    Dr. Cohen has been employed continuously at Unum since 2003. Trial Tr. 109.

55.    Since becoming an employee of Unum, Dr. Cohen has not treated patients. Instead, she provides medical opinions based upon her education, training, and experience, which are used in Unum's claims administration process. Trial Tr. 109.

---

[1] The parties stipulated at trial that any references to Unum would be treated as a reference to Defendant Provident. Trial Tr. at 4.

56.    Dr. Cohen was never asked to render an opinion relating to Angelika Nabi's cognitive condition in 2009. Dr. Cohen never attempted to evaluate Ms. Nabi's condition as of 2009. Trial Tr. 107.

57.    Dr. Cohen was also not asked by anyone at Provident to consider any questions regarding the timeliness of Ms. Nabi's notice of claim. Trial Tr. 107.

58.    Dr. Cohen has had significant experience reviewing medical questions that arise in the context of disability claims at Provident. Trial Tr. 110.

59.    As a medical consultant, Dr. Cohen testified that she would have no involvement in the actual decision to grant or deny Ms. Nabi's, or anyone else's, claim.  Trial Tr. 115.

60.    Instead, the individuals at Unum who are tasked with making those determinations would ask Dr. Cohen for a specific medical opinion regarding a claimant, and after receiving that opinion from Dr. Cohen, those other individuals would make a decision regarding the claim based upon the medical opinion. Trial Tr. 115.

61.    In Dr. Cohen's experience, rendering any opinion about a medical question begins with a review of the claimant's medical records, statements from the attending physician as well as any conversations a benefit specialist might have had with the insured.  Trial Tr. 111.

13

62.    Dr. Cohen testified that when a medical consultant such as herself is unable to render an opinion based on the medical records, she attempts to discuss the issue directly with the claimant's attending physician. This allows her as Unum's medical consultant to tell the attending physician what her understanding of what the claimant's medical records show and provides the attending physician an opportunity to explain whether he or she agrees or disagrees with her understanding or assessment. Trial Tr. 112.

63.    In her experience, if, after completion of an interview with a claimant's attending physician, Dr. Cohen has a difference of opinion with that attending physician, it has been Unum's policy to engage the services of a third, independent physician to review that particular medical question. Trial Tr. 112-113.

64.    With regard to Ms. Nabi's claim, Dr. Cohen was not asked to consider whether Ms. Nabi had a medical condition impairing her ability to give Provident notice of claim under the Policy at the time she ceased working in 2009. She was asked only to render an opinion as to Ms. Nabi's restrictions and limitations as of August 1, 2017. Trial Tr. 113.

65.    "Restrictions and limitations" is a term used in disability benefits claims meaning whether a particular claimant was restricted or limited from particular activities due to some kind of impairment.  Trial Tr. 114.

14

66.    Dr. Cohen testified that it would be "absolutely" inappropriate for her, or any other medical consultant at Unum, to render a medical opinion by deciding at the outset of the analysis that a claim can be either denied or approved based upon rendering the opinion in a certain way. Trial Tr. 115.

67.    Dr. Cohen also testified that it would not be her practice as a longtime medical consultant at Unum to cherry pick parts of a medical record that support an opinion and ignore others. Trial Tr. 116.

68.    Dr. Cohen testified that it was important that a medical opinion review process not be influenced or even appear to be influenced by how a claim can be denied or approved. Trial Tr. 116.

69.    With regard to the only question Dr. Cohen was asked by Provident to render an opinion about—whether Ms. Nabi had restrictions and limitations as of August 1, 2017—Dr. Cohen first became involved after a Provident registered nurse performed a "clinical analysis" of Ms. Nabi's medical records and suggested that the opinion of a doctor would be needed. Trial Tr. 118, 120.

70.    Dr. Cohen testified that in her 22 years of experience as a medical consultant working in disability benefits claims for Unum, the type of medical question she was asked with regard to Ms. Nabi's claim, i.e., her cognitive condition as of August 1, 2017,  is the type of question that would require an opinion of a medical consultant such as herself. Trial Tr. 121.

71.    After reviewing Ms. Nabi's medical records from the 2017 time period and having discussed the matter with other specialists at Unum, Dr. Cohen decided she needed to contact Ms. Nabi's attending physician to render an opinion as to Ms. Nabi's cognitive condition as of August 1, 2017. Trial Tr. 121.

72.    Dr. Cohen testified that her telephone contact with Ms. Nabi's attending physician, Dr. Castiglia, was for Ms. Nabi's "benefit," to make sure she was not missing anything regarding her condition. Trial Tr. 122.

73.    Dr. Cohen understood that Dr. Castiglia was Ms. Nabi's neurosurgeon when she contacted him. Trial Tr. 123.

74.    Although Dr. Cohen could not recall any personal experience of treating patients with glioblastoma, she did have an understanding of the exceptionally poor prognosis of that disease as well as the course of treatment Ms. Nabi had endured.  Trial Tr. 124-125.

75.    Dr. Cohen spoke to Dr. Castiglia one time, by telephone, on July 25, 2022. Trial Tr. 123.

76.    During their telephone call, Dr. Castiglia explained to Dr. Cohen that Ms. Nabi was suffering the effects of radiation treatment and that a dementia had set in.  He also informed her that as of 2009, Ms. Nabi was no

longer able to work due to cognitive issues resulting from her whole brain radiation treatment. Trial Tr. 125.

77.    Dr. Cohen testified that after her phone call with Dr. Castiglia, she was in agreement with Dr. Castiglia that Ms. Nabi was suffering the effects of radiation treatment. She determined that Ms. Nabi had restrictions and limitations as of August 1, 2017, the specific and only time period she had been asked by Provident to assess. Trial Tr. 106, 125.

78.    Dr. Cohen testified that in reaching her conclusions and medical opinion regarding Ms. Nabi's condition as of August 1, 2017, she relied on the information and opinions regarding Ms. Nabi's cognitive condition provided by Dr. Castiglia. Trial Tr. 126.

79.    Dr. Cohen admitted that had she disagreed with Dr. Castiglia, she could have spoken to any of Ms. Nabi's other treatment providers, but she did not because she was in agreement with Dr. Castiglia. Trial Tr. 126.

80.    Similarly, Dr. Cohen did not seek to have a third party, independent physician assess Ms. Nabi's cognitive condition, because she agreed with Dr. Castiglia. Trial Tr. 127.

81.    Dr. Cohen reiterated on the stand that she was not asked to consider Ms. Nabi's condition at any other time period other than August 1, 2017. Trial Tr. 126.

82.    To Dr. Cohen's knowledge, there was no other medical consultant assigned by Provident to review any other medical questions associated with Ms. Nabi's claim. Trial Tr. 127.

83.    Dr. Cohen testified that the task of filing an insurance claim is difficult even for many people who do not have cognitive impairments.  Trial Tr. 131.

84.    With regard to the particular question of whether a claimant would have been able to file an insurance claim in light of a cognitive impairment, Dr. Cohen testified that in her experience at Unum, that question would be an appropriate question to have a medical consultant such as herself assess the cognitive capacity of the claimant.  But she was not asked to assess this question regarding Ms. Nabi's cognitive condition as of December 2009. Trial Tr. 134.

85.    Weeks before Dr. Cohen contacted Dr. Castiglia, on June 24, 2022, Matthew Roop, a Provident employee responsible for administering Ms. Nabi's benefits claim, emailed Dan Flynn, an in-house attorney at Provident, to ask for Mr. Flynn's "legal advice…if an insured had a cognitive impairment or a disability that could have rendered her unable to file sooner." In the same message, Mr. Roop also advised Mr. Flynn that the Provident claims manual required them "to determine if the late notice is reasonable, factoring in the nature of the [claimant's] medical condition."  Joint Exhibit 1F, at 3.

86.    Neither Mr. Roop nor Mr. Flynn are medical consultants at Provident. Trial Tr. 135.

87.    Despite the fact that Mr. Flynn was informed by Mr. Roop on June 27, 2022, that the Provident claims manual requires it to consider whether Ms. Nabi's late notice was "reasonable, factoring in the nature of the medical condition" of Ms. Nabi, Dr. Cohen was never asked by anyone at Provident to assess the nature of Ms. Nabi's medical condition as of December 2009, when she became totally disabled from work. Trial Tr. 136.

88.    As a result, when Dr. Cohen spoke to Dr. Castiglia four weeks later, on July 25th, 2022, she did not ask him about Ms. Nabi's cognitive impairment as of December 2009, nor did she make any attempt to assess Ms. Nabi's condition as of that date, even though Dr. Castiglia did inform her that Ms. Nabi was unable to work by 2009 due to cognitive impairments. Trial Tr. 126.

89.    Although Mr. Flynn and Mr. Roop did not seek to have a medical consultant such as Dr. Cohen provide an opinion as to Ms. Nabi's cognitive condition in 2009, as Dr. Cohen testified would have been Unum's standard practice, Mr. Flynn directed Mr. Roop to see if a guardianship, conservatorship or other declaration of incompetence had been made by any "relevant judicial authority." Joint Exhibit 1F.

90.     When assessing Ms. Nabi's cognitive capacity as of August 1, 2017, Dr. Cohen did not inquire as to a declaration of a guardianship or conservatorship.   Dr. Cohen testified those would be legal questions, not medical questions. Trial Tr. 135-136.

91.     Notably, Dr. Cohen simply did not testify or opine as to the specific question of fact at issue in this trial: Ms. Nabi's cognitive condition as of December 2009 and whether her late notice of claim was reasonable, factoring in that medical condition. Nevertheless, her testimony regarding the standard custom and practice at Provident for analyzing questions relating to a claimant's cognitive capacity at a particular point in time was clarifying. In addition, Dr. Cohen, Provident's own medical consultant, did not testify to any areas of disagreement with Dr. Castiglia.   On the contrary, she found him to be reliable and credible.

## CONCLUSIONS OF LAW

This is an ERISA disability benefits case brought pursuant to 29 U.S.C. § 1132(a)(1)(B).   Here, the parties do not dispute that the Plaintiff was disabled within the meaning of the long-term disability benefits policy administered by Provident.   Nor can it be disputed that as administrator of the Policy, charged with making the determination regarding Plaintiff's claim for benefits, Provident

stood as a fiduciary to Plaintiff, with a duty to "consider the interests of deserving beneficiaries as it would its own." *Gaither v. Aetna Life Ins. Co.*, 394 F. 3d 792, 808 (10th Cir. 2004).

Instead, this case centers on Provident's decision to deny the vast majority of the claim of Plaintiff Angelika Nabi ("Plaintiff") based solely upon its conclusion that Plaintiff's claim was filed unreasonably late under the terms of the Policy. The Court has jurisdiction of this action pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331.

Prior to this bench trial, both parties interposed summary judgment motions, which were denied. *Nabi v. Provident Life and Casualty Insurance Co.*, 789 F. Supp. 3d 277 (W.D.N.Y. 2025). In denying the motions, this Court determined there was a material question of fact regarding Plaintiff's cognitive condition and her concomitant ability to submit an insurance claim under the policy at the time she became fully disabled in December 2009. This Court also found there was good cause under *Locher v. Unum Life Ins. Co. of America*, 389 F. 3d 288 (2d Cir. 2004) to admit the declaration from Plaintiff's treating physician, Dr. Gregory J. Castiglia into the administrative record.

To resolve the issue of fact identified by this Court at the summary judgment stage, a daylong bench trial was held on this issue with two witnesses: Plaintiff's treating physician, Dr. Castiglia, and Provident's in-house medical

consultant, Dr. Judith M. Cohen. Both witnesses offered direct testimony and were subject to cross-examination.

For the reasons stated below, the Court finds that Plaintiff has established by a preponderance of the evidence that at the time she ceased working in December 2009, under all of the attendant circumstances, including her cognitive condition, she was not reasonably able to give notice of claim under the Policy, and as a result, the delay in providing her notice of claim was reasonable under the terms of the Policy, and she is entitled to receive disability benefits from December 2009 forward.

This Court reviews the denial of benefits to Plaintiff under the Policy de novo. *See Nabi v. Provident Life and Casualty Insurance Co.*, 789 F.Supp.3d 277, 286 (W.D.N.Y. 2025). On de novo review, the Court "stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that she is entitled to benefits under the plan." *McDonnell v. First Unum Life Ins. Co.*, No. 10 Civ. 8140 (RPP), 2013 WL 3975941, at *12 (S.D.N.Y. Aug. 5, 2013). *See also Collier v. Lincoln Life Assurance Co. of Boston*, 53 F. 4th 1180, 1186 (9th Cir. 2022) ("When the district court applies de novo review, it accords no deference to the plan administrator's decision. Rather, the court simply

proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits.") (cleaned up).

As this Court has already determined, the Policy at issue here includes this language, "in a provision titled 'Notice of Claim,' the policy states: 'Written notice of claim must be given within 20 days after a covered loss starts or as soon as reasonably possible." 789 F.Supp.3d at 279. In addition, it is undisputed that according to Provident's own claims manual, it was obligated to "determine if the late notice was reasonable, factoring in the nature of the [claimant's] medical condition." *Id.*, at 283.

However, despite what its own claims manual required it to do, and despite the standard practice for assessing a claimant's cognitive condition as described by Provident's own medical consultant at trial, Provident took essentially no steps to assess the nature of Plaintiff's medical condition at the time she ceased working completely and became fully disabled within the meaning of the Policy, as of December 2009.

Instead, Provident—despite being a fiduciary to Plaintiff—internally discussed its intent to deny the claim, then erected a new standard (not found in its claims manual and not found in the Policy) of legal incapacity, a standard which this Court has already held to be higher than what was in the Policy. FOF ¶ 89, 789 F.Supp.3d at 808.

As Provident's own medical consultant, Dr. Cohen, testified, whether a claimant had the cognitive capacity to file a claim was a medical question requiring the opinion of a medical consultant. FOF ¶ 84. In this case however, Provident inexplicably kept this question from Dr. Cohen, the in-house medical consultant assigned to work on this claim. FOF ¶ 87. Further, as Dr. Cohen also testified, it would be "absolutely" inappropriate to allow questions of how a claim might be denied or approved color a medical review process. FOF ¶ 66. Yet that is exactly how Provident went about considering Plaintiff's notice of claim.

In essence, Dr. Cohen's testimony explained how Provident *should have* gone about considering whether Plaintiff's delay in filing her notice of claim under the Policy was reasonable in light of her medical condition in 2009. Dr. Cohen's testimony regarding her standard practice over her 22 years at Unum stands in sharp relief to the lapses in how Provident handled this claim from the very beginning.

The fact that Provident, against its standard practice, did not involve Dr. Cohen, its own medical consultant, in the question whether Plaintiff's "late notice was reasonable, factoring in the nature of the medical condition" is a startling revelation. At the summary judgment phase, Provident represented to this Court that, "Provident conducted a thorough review of Plaintiff's claim,

appropriately consulted with medical professionals, and properly applied the Policy's terms and conditions to reach a determination regarding coverage." Dkt. 33, 2. Provident has never corrected this misstatement of material fact. More troubling, Provident (through its prior counsel) then attempted to avoid having Dr. Cohen testify at all in this case by falsely representing (without her knowledge) to the Court that she was unavailable to testify on the trial date of December 3, 2025. Dkt# 67-69.

The trial testimony was clear that Dr. Cohen simply was never asked by anyone at Provident to render an opinion as to Plaintiff's cognitive condition as of December 2009. She did not testify to Plaintiff's condition in December 2009 at trial. As a result, Provident simply offered no evidence at trial to support its decision that Plaintiff was reasonably capable of submitting a notice of claim in December 2009.

Plaintiff offered the testimony of Dr. Castiglia, who testified that in his opinion, as of 2009 when Plaintiff stopped working, she would not have been able to submit the notice of claim as a result of the long-term and permanent adverse effects on her cognitive ability due to her treatment for glioblastoma multiforme, including high levels of whole brain radiation and chemotherapy. FOF ¶ 40.

The Court gives considerable weight to Dr. Castiglia's testimony. Dr. Castiglia has extensive experience in treating patients with glioblastoma multiforme as well as patients who have suffered brain injuries or disorders as a result of some other disease or injury. FOF ¶¶ 6-7. Dr. Castiglia is a board-certified and deeply experienced neurosurgeon, conducting up to 500 surgeries every year. FOF ¶¶ 2-6.

It bears emphasizing that Dr. Castiglia has treated Plaintiff since her diagnosis in 2003 and still treats her. FOF ¶¶ 23-34. He saw her multiple times per year in the first several years after her diagnosis. FOF ¶ 31. The Court credits Dr. Castiglia's depth of experience with glioblastoma multiforme, with the adverse effects of radiation treatment, and with his patient, whom he has personally treated for over two decades. This Court notes that "[c]ourts have typically afforded greater weight to the opinions of physicians who have treated the claimant for an allegedly disabling condition for a long period of time and to doctors whose specialty relates to the alleged disability." *Haag v. Unum. Life Ins. Co. of Am.*, No. 22-CV-03130-TSH, 2023 WL 6960369, at \*14 (N.D. Cal. Oct. 20, 2023) (cleaned up). Moreover, Dr. Castiglia's opinion that Plaintiff suffered cognitive damage as a result of her radiation treatment was consistent not just with his personal observations and interactions of and with her as a patient, as

he explained, it is consistent with the well-known long-term effects of radiation treatment on the brain.  FOF ¶¶ 32-36.

Against Dr. Castiglia's unrebutted testimony, Provident's attempts to find certain portions of the administrative record that call into question Plaintiff's cognitive condition are unpersuasive. In essence, Provident would seek to have this Court "cherry-pick the evidence it prefers while ignoring significant evidence to the contrary." *Winkler v. Metro. Life Ins. Co.*, 170 Fed. Appx. 167, 168 (2d Cir. 2006) (cleaned up). *See also Dewsnup v. Unum Life Insurance Company Of America*, 2018 WL 6478886, at *9, n. 3 (D. Utah December 10, 2018) ("The way in which Unum's reviewers evaluated [the plaintiff's] claim is itself troubling. Under ERISA and its regulations, *the claim process is not designed to be adversarial* [and] Unum may not cherry-pick the information helpful to its decision to deny a claim.") (cleaned up) (emphasis added).

Nor does Provident's "cherry-picking" approach make sense in light of its own medical consultant's testimony. Dr. Cohen testified that she, while in possession of the same medical records that are before this Court as part of the administrative record, was unable to render an opinion regarding Plaintiff's cognitive condition as of August 1, 2017 without speaking to her treating physician, Dr. Castiglia.  She further testified that she, on behalf of Provident, could have spoken to any other of Plaintiff's treatment providers (besides Dr.

Castiglia) if she had reason to disagree with or doubt what Dr. Castiglia had expressed to her. The fact of the matter is Dr. Cohen spoke with Dr. Castiglia, agreed with his opinion, and relied on his opinion in order to make her own assessment regarding Plaintiff's cognitive condition as of August 1, 2017. Finally, Dr. Cohen herself testified that it would be inappropriate to cherry pick parts of a medical that support an opinion and ignore others. FOF ¶ 67.

Likewise, any attempt to take aim at Dr. Castiglia's opinion by attempting to diminish the foundation for his opinion because he is not a neuropsychologist or did not send Plaintiff to a formal cognitive evaluation misses the mark. Provident itself, through its medical consultant, relied on Dr. Castiglia to give an assessment as to Plaintiff's cognitive condition as of August 1, 2017. FOF ¶ 78. In effect, Provident is arguing that Provident, through its own medical consultant Dr. Cohen, relied on Dr. Castiglia to offer an opinion as to Plaintiff's cognitive condition as of August 1, 2017, but that Dr. Castiglia is somehow not qualified to offer an entirely consistent opinion as to Plaintiff's cognitive condition as of December 2009. This inherently contradictory position of Provident's does not withstand scrutiny.

Further, to the extent that Provident now seeks to rely on purported gaps in the record around the time of December 2009 to uphold its denial of Plaintiff's claim, its approach runs afoul of bedrock ERISA principles.

Provident's approach would suggest "that as a plan fiduciary, [Provident] plays a role like that of a judge in a purely adversarial proceeding, where the parties bear almost all of the responsibility for compiling the record, and the judge bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim." *Gaither v. Aetna Life Ins. Co.*, 394 F. 3d 792, 807 (10th Cir. 2004). As the Court in *Gaither* explained, that is not the role of a claims administrator under ERISA, and Provident "has the wrong model." *Id.*

ERISA and its implementing regulations require a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied, the reason for the denial must be stated in reasonably clear language, and if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. *Id.*

In this case, Provident has admitted that by April 27, 2022, it was in possession of unrestricted authorizations to obtain Plaintiff's medical records. *See* Dkt. 33-1, at ¶ 27. Nevertheless, a month later, on May 31, 2022, Provident decided, in an internal communication and prior to conducting any medical review of Plaintiff's claim, that Plaintiff "could have notified us of her disability... earlier than she did" and elected to request only medical records from 2016 forward. Joint Exhibit 1, Dkt. 29-2, 219-220.

Months later, when deciding Plaintiff's appeal of its decision to deny her benefits from December 2009 forward, Provident stated to Plaintiff that "the Benefits Center requested your medical records and were unable to retrieve any prior to approximately 2016." Joint Exhibit 1, Dkt. 29-2, 692. This statement was false. Provident had *internally* decided to limit its records request to records from 2016 forwards; it was not "unable to retrieve" older records as it stated to Plaintiff in the denial of her appeal. Provident further admitted in that same written notice that although Plaintiff *again* provided authorization for Provident to retrieve all of her medical records, it would "not be requesting this information." Joint Exhibit 1, Dkt. 29-2, 694.

It is well settled that ERISA contemplates that "ERISA plan administrators and beneficiaries [have] a full and meaningful dialogue regarding the denial of benefits." *Glista v. Unum Life Ins. Co.*, 378 F.3d 113, 129 (1st Cir.2004). In addition, "[a]n ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 808 (10th Cir. 2004).

Here, Provident was repeatedly made aware during the claims administration that Plaintiff claimed that cognitive deficits resulting from her diagnosis and treatment for glioblastoma multiforme had rendered her unable to provide a notice of claim in 2009. Nevertheless, Provident intentionally chose

30

not to retrieve Plaintiff's medical records from that period, deciding internally (contrary to its own claims manual and contrary to standard practice as testified to by Dr. Cohen) to deny Plaintiff's claim without having conducted any medical review. Then, in its formal decision on Plaintiff's appeal, Provident falsely stated to Plaintiff that it had been "unable" to retrieve the very records it chose not to retrieve.

Now, Provident seeks to rely on the very gap in the record that it intentionally created (and which it misled Plaintiff about) as justification for its denial of Plaintiff's claim. Provident's approach would turn fundamental ERISA principles on their head. It would be profoundly inequitable for Provident to use its intentional failure to abide by its fiduciary duty to investigate Plaintiff's claim as a sword against Plaintiff in this Court.

It should also be noted that although none of Provident's arguments are meritorious, they all constitute impermissible post-hoc rationales which were not communicated to Plaintiff at the conclusion of the claims administration process. In deciding her appeal, Provident explained to Plaintiff that "it does not appear that a guardian or conservator had been appointed, or that you otherwise had been deemed mentally incompetent by relevant judicial authority." 789 F.Supp.3d at 384, Joint Exhibit 1 at 692. Having cited this as the basis for its denial, Provident is foreclosed from seeking to uphold its denial

based on new justifications, such as attacking Dr. Castiglia's experience or cherry-picking parts of Plaintiff's medical records. *See Collier v. Lincoln Life Assurance Co. of Boston*, 53 F. 4th 1180 (9th Cir. 2022) ("A plan administrator undermines ERISA and its implementing regulations when it presents a new rationale to the district court that was not presented to the claimant as a specific reason for denying benefits during the administrative process"). *See also Spradley v. Owens-Ill. Employees Welfare Ben. Plan*, 686 F. 3d 1135, 1140 (10th Cir. 2012) ("The reason for this rule is apparent: we will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation.").

The proof before the Court amounts to this: in 2003, Plaintiff was diagnosed with a devastating and fatal disease. She was told by her treatment providers that she had only 9-12 months to live. Plaintiff was thrown from everyday life as a working mother and wife into a blackened tunnel of grueling treatments, with the only foreseeable exit an all but certain death. High doses of radiation were pumped into her brain with the simple yet brutal rationale that she would not live long enough to see the negative side effects of that treatment. It is a widely understood consequence of radiation treatment that significant

effects, including significant cognitive deficits, can appear months and years after treatment is complete.

Plaintiff has survived more than two decades since her diagnosis with glioblastoma multiforme. Her survival is exceptional, even miraculous. But the gauntlet of cancer treatment that Plaintiff endured to achieve that survival—multiple brain surgeries, the repeated bombardment of high doses of radiation to her brain, extensive chemotherapy—took an indisputable and permanent toll. Dr. Castiglia's unrebutted testimony that by 2009, Plaintiff was fundamentally changed as a person, in her mood, her behavior, and her level of function as a result of several years of treatment is credible and persuasive to this Court.

It is clear that from the outset of handling this claim, Provident has viewed Plaintiff's delay in filing her notice of claim as disqualifying. In its attempt to reach a decision that would match its own predetermined view of the claim, Provident intentionally limited its review of Plaintiff's available medical records, cast aside the terms of its own Policy, disregarded the requirements of its own claims manual, kept a critical question requiring the input from a medical doctor from its own medical consultant, and invented a new standard for the award of benefits not found in the Policy. In sum, Provident simply "shut its eyes" to any evidence that might support Plaintiff's claim. *Harrison v. Wells Fargo Bank, NA,* 773 F.3d 15, 24 (4th Cir. 2014).

The only testimony before the Court about Plaintiff's ability to submit a notice of claim at the time she became fully disabled in December of 2009 is from Dr. Castiglia, the same doctor on whom Provident's medical consultant relied when determining Plaintiff was fully disabled as of August 1, 2017.

Accordingly, based on the preponderance of evidence presented to the Court at trial, the Court finds that Plaintiff, due to the cognitive impacts resulting from her treatment for glioblastoma multiforme, more likely than not, was not reasonably able to file a notice of claim within 20 days of her becoming totally disabled under the meaning of the Policy as of December 2009, and that her delay in filing her notice of claim was therefore reasonable under the terms of the Policy.

Judgment shall be entered upon the claim for benefits and Provident shall thereafter commence prompt payment of disability benefits to Plaintiff based on the disability date of December 2009.

DATED:    February 12, 2026
          Buffalo, NY

                              Respectfully Submitted,


                              ___/s/ Daniel J. Brady_____
                              Daniel J. Brady, Esq.
                              Michael A. Brady, Esq.
                              HAGERTY & BRADY
                              69 Delaware Ave. Suite 1010

Buffalo N.Y. 14202
(716) 856-9443 office
(716) 856-0511 fax
dbrady@hagerty-brady.com

*Attorneys for Plaintiff*