**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**ANGELIKA NABI,**

        **Plaintiff,**

    **-v-**                           **1:23-CV-00844-HKS**

**PROVIDENT LIFE AND CASUALTY**
**INSURANCE COMPANY.,**

        **Defendant.**

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Angelika Nabi ("Nabi") brought this action against defendant Provident Life and Casualty Insurance Company ("Provident") to recover long-term disability benefits, alleging that Provident violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Dkt. #1.[1]

In accordance with 28 U.S.C. § 636(c), the parties consented to have the undersigned conduct all further proceedings in this case, including entry of final judgment.  Dkt. #15.

On June 30, 2025, the Court entered a Decision and Order denying the parties' dispositive motions on the grounds that genuine issues of material fact existed as

---

[1] The parties agree that the plan at issue is covered by ERISA.

to whether Nabi filed her claim for benefits "as soon as reasonably possible" under relevant provisions of the Provident policy. Dkt. #40.

On December 3, 2025, the Court held a bench trial and, on February 12, 2026, the parties filed proposed findings of fact and conclusions of law. Dkt. ##80, 81. For the reasons explained below, the Court concludes that Nabi has proven by a preponderance of the evidence that she is entitled to long-term disability benefits under the Provident policy with a disability onset date of December 31, 2009.

### FINDINGS OF FACT[2]

Following a bench trial conducted in an ERISA case such as this, "the district court must find the facts specially" and "judge the credibility of witnesses." *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d. Cir. 2001) (citations and internal quotation marks omitted). The Court thus sets forth its factual findings based on the administrative record, as well as the bench trial testimony, in the numbered paragraphs below.[3]

---

[2] The transcript of the bench trial is found at Docket Entry #75. In addition, the parties stipulated to the admission of joint exhibits. Dkt. #73. These exhibits, which were submitted to the Court in paper form for purposes of the bench trial, encompass the administrative record previously filed in the record. Dkt. #29. The Court will thus cite to the ECF page numbers.

[3] "To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa." *Khan v. Provident Life and Accident Ins. Co.*, 386 F. Supp.3d 251, 254 (W.D.N.Y. 2019) (citation omitted).

**The Provident Insurance Policy** [4]

1.      At all relevant times leading up to the events at issue in this case, Nabi was employed as the office manager of her husband's medical practice, ENT Medical Associates ("ENT"). Dkt. #29-2, p. 645; Dkt. #75, p. 13.

2.      Nabi's job duties included general office work, checking all correspondence, payroll, communications to other doctor's offices, paying office bills, maintaining bank accounts, and checking office supplies. Dkt. #29-2, p. 645.

3.      The cognitive demands of her job included meeting deadlines, attention to detail, day-to-day contact with others, and making independent decisions. Dkt. #29-2, p. 646.

4.      Through her employment, Nabi obtained a policy of disability benefits under an employee welfare benefit plan maintained by ENT with Provident. Dkt. #29, pp. 1-22. The policy provides disability insurance income to the policyholder upon the occurrence of "total disability." Dkt. #29, p. 5.

5.      "Total disability" is defined, in relevant part, as when the employee, due to injury or sickness, is unable to perform the substantial and material duties of her occupation and is receiving appropriate care for that condition from a physician. Dkt. #29, p. 7.

---

[4] The parties stipulated at the bench trial that any references to Unum, Provident's parent company, would be treated as references to Provident. Dkt. #75, p. 4.

6.     The policy provides different maximum benefits periods depending on the age of the employee when she becomes disabled, and it also states that after the policyholder has been totally disabled for 90 days during a period of disability, any premiums which were due and paid by the policyholder will be refunded, and payment of premiums during the period of total disability is waived. Dkt. #29, p. 9.

7.     In a provision titled "Notice of Claim," the policy states: "Written notice of claim must be given within 20 days after a covered loss starts *or as soon as reasonably possible*." Dkt. #29, p. 12 (emphasis added).

8.     Under a section titled "Claim Forms," the policy states: "When we receive your notice of claim, we will send you claim forms for filing proof of loss." Dkt. #29, p. 12. It further states, "You must give us this proof within the time set forth in the Proof of Loss section." *Id.*

9.     The "Proof of Loss" section states, in relevant part, that the policyholder then must provide proof of loss within 90 days "after the end of each period for which we are liable," unless it was not reasonably possible for the policyholder to do so, in which case the proof of loss must be furnished no later than one year after the 90 days unless the policyholder is legally unable to do so. Dkt. #29, pp. 12-13.

10.     Coverage under this policy was guaranteed to the employee until age 65, at which time a conditional right of renewal attached. Dkt. #29, p. 3. The employee was

entitled to renew the policy at age 65 so long as she was "actively and gainfully working full time," unless she had stopped working due to "total disability." Dkt. #29, p. 11.

11.     Nabi's date of birth is September 5, 1952. Dkt. #29-2, p. 88. Therefore, she turned 65 on September 5, 2017.

**<u>Nabi's Brain Cancer Diagnosis and Testimony About Her Treatment</u>**

12.     In August of 2003, Nabi was seen by Dr. Gregory Castiglia after having a seizure. Dkt. #75, pp. 12-13. Dr. Castiglia is a board-certified neurosurgeon with the State University of New York at the Buffalo Department of Neurosurgery. Dkt. #75, pp. 5-7.

13.     After a lesion found in Nabi's brain was biopsied, she was diagnosed with Glioblastoma Multiforme ("GBM"), a type of brain cancer. Dkt. #75, p. 13.

14.     Dr. Castiglia testified that a glioblastoma is the most aggressive form of brain tumors and that patients who are diagnosed with GBM typically have a survival rate of 6 to 12 months. Dkt. #75, pp. 9-10.

15.     Treatment for GBM begins with surgical removal of any visible tumor, but because GBM tumors—called "spider" tumors—extend into surrounding tissues, the patients are also treated with a combination of chemotherapy and radiation. Dkt. #75, p. 11. With such aggressive treatment, a patient's life span may be extended to 2 or 3 years. Dkt. #75, p. 12.

16.    GBM tumors are often very advanced when they are discovered, and patients often succumb to the disease because treatment cannot improve their outcome without severely devastating their neurologic functioning. *Id.*

17.    Following Nabi's diagnosis, Dr. Castiglia performed surgery for a gross total resection of the lesion in Nabi's right temporal lobe area. Dkt. #75, pp. 15-16. Dr. Castiglia testified that he did not believe that the surgery removed 100% of the tumor cells in Nabi's brain. Dkt. #75, p. 17.

18.    Thereafter, Nabi was referred to a neurooncologist and she underwent chemotherapy and whole-brain radiation. Dkt. #75, p. 15. Because Nabi's diagnosis was considered terminal, she was given a higher-than-normal dose of radiation. Dkt. #75, p. 20.

19.    Dr. Castiglia testified that the brain is very sensitive to radiation, and radiation can cause side-effects such as radiation necrosis, where parts of the brain lose their blood supply and become necrotic. Dkt. #75, p. 17. The side effects of whole-brain radiation can also cause mental status changes. Dkt. #75, pp. 17-18.

20.    Side effects of whole-brain radiation often manifest months or years after the radiation has been completed. Dkt. #75, p. 19. However, because most GBM patients do not live very long, they die before such side effects appear. Dkt. #75, p. 20.

21.     Dr. Castiglia has treated very few GBM patients who have survived more than two decades. Dkt. #75, p. 21.

22.     Dr. Castiglia testified that he has treated Nabi continuously from the time of her diagnosis in 2003 until the present. Dkt. #75, pp. 22, 27. He further testified that she developed a gradual inability to perform her managerial tasks at work and would make errors. Dkt. #75, p. 23. He also observed that there was a change in her personality and her ability to remember events that had taken place. *Id.*

23.     Dr. Castiglia explained that the change in Nabi's level of functioning was subtle and progressive, and that there were changes in her mood and behavior: "[T]his is a lady who was very confident and became much more withdrawn over the course of several years of treatment." Dkt. #75, p. 30. He testified that it became evident that she was not going to be able to continue functioning in her job. Dkt. #75, p. 31.

24.     Dr. Castiglia also testified that he bases his assessment of his patients' cognitive status on his personal interactions with them, as well as input from their family members. Dkt. #75, pp. 25-27. He also testified that long-term cognitive function impacts following radiation treatment to the brain are seen in patients who survive for long periods of time. Dkt. #75, p. 27.

25.     Next, Dr. Castiglia testified that early on in his treatment of Nabi, he would see her every six weeks, and then every three months. Dkt. #75, p. 28. After two or three years, he would see her every six months with repeat imaging studies, and then once a year thereafter. *Id.*

26.     Dr. Castiglia was asked about records of Nabi's evaluations by Dr. Laszlo Mechtler ("Dr. Mechtler"), her neurooncologist. Dkt. #75, p. 32. Dr. Castiglia explained that these records reflect that Dr. Mechtler assessed, based on MRIs going back to 2009, that Nabi had progressive "ventriculomegaly," which is the retention of cerebral spinal fluid in the ventricles of the brain which, under normal circumstances, is absorbed into the body. Dkt. #75, p. 33. The result is that the fluid sacs in the brain enlarge, creating tension on the neuron tracts that cross the ventricles. *Id.* The distention of the major tract, the corpus callosum, is often associated with cognitive issues, gait disturbances, and incontinence. *Id.* It is often a side effect of radiation to the brain. Dkt. #75, pp. 33-34.

27.     Dr. Castiglia testified that these records reflect objective visual findings of changes to Nabi's brain that were visible in 2009. Dkt. #75, p. 35.

28.     Dr. Castiglia testified that Nabi was hospitalized following a possible seizure in June of 2020 and, because of the progressive changes in her mental status, he recommended that she undergo surgery for the placement of a shunt in her brain to remove some of the fluid and attempt to reverse some of the symptoms she was experiencing. Dkt. #75, pp. 35-37.

29.     Dr. Castiglia further testified that, by the time he was informed that Nabi was going to stop working completely, he believed that her cognitive and executive functions had been impaired due to the accumulated radiation and chemotherapy treatments. Dkt. #75, p. 38.

30.     Dr. Castiglia also testified that, at the time he learned that Nabi was going to quit working, it would have been outside of her mental processing ability to read and understand the terms of her insurance policy. Dkt. #75, p. 39. He based this opinion on his years treating her and the changes he had seen since her diagnosis. *Id.*

31.     On cross-examination, Dr. Castiglia testified that he did not know whether any physical impairments also played a role in Nabi's decision to stop working in 2009. Dkt. #75, p. 46. Regarding her cognition, Dr. Castiglia testified that he has known Nabi for many years and "can tell when something's not right." Dkt. #75, p. 49.

32.     When asked if he ever observed any radiation necrosis on the MRIs of Nabi's brain, Dr. Castiglia testified that necrosis will not always show on MRIs, but rather it is a pathological diagnosis that is confirmed by a biopsy of brain tissue, but they did not decide to do that with Nabi. Dkt. #75, p. 51.

33.     Dr. Castiglia also testified that, prior to performing surgeries on Nabi, he obtained her informed consent "in consultation with her family" upon whom she relied heavily. Dkt. #75, p. 55.

34.     When shown records of Nabi's office visits with Dr. Mechtler in 2016, 2017, 2019, and 2020 which stated "yes" on a line titled "Does Patient Drive," Dr. Castiglia testified that he would question the accuracy of those entries. Dkt. #75, p. 76. Similarly, he testified that he could not know whether a notation on a 2019 office visit note of Dr. Sameer Mamnoon ("Dr. Mamnoon"), Nabi's primary care doctor, stating "*He* [*sic*] was able to drive herself to the office today," meant that Nabi had driven herself to the appointment. Dkt. #75, p. 78 (emphasis added).

35.     On cross-examination, Dr. Castiglia again testified that he believed that the cognitive issues caused by Nabi's treatment for her brain tumor prevented her from being able to file a claim under her insurance policy when she stopped working in 2009. Dkt. #75, p. 83.

36.     On re-direct examination, Dr. Castiglia testified that information in some of Dr. Mechtler's notes of Nabi's appointments was either internally contradictory or factually incorrect. Dkt. #75, pp. 84-89.

37.     Dr. Castiglia also testified that he did not believe that a treatment note of Dr. Mechtler's dated July 28, 2020 indicating that Nabi was still driving was correct because he saw Nabi on August 5, 2020—approximately one week later—and she was confused, in a wheelchair, unable to stand without assistance, and unable to ambulate. Dkt. #75, pp. 89-91.

38.     The Court finds Dr. Castiglia's testimony and opinions to be credible and persuasive.

**Nabi Files a Claim Under the Provident Policy in 2021**

39.     On September 8, 2021, Provident received a claim form request pertaining to Nabi from a financial adviser, and Provident sent the adviser a claims form that day. Dkt. #29-3, pp. 41-42.

40.     On April 12, 2022, Nabi submitted to Unum an Individual Disability Claim Form claiming a disability onset date of August 2003 and stating that her last day worked was January 1, 2004. Dkt. #29-2, p. 41. She stated that her medical condition was GBM; she was incapacitated, in a wheelchair and unable to stand or walk; she had memory loss; she had undergone four brain surgeries, three facial surgeries, and two knee surgeries; and she had been an office manager prior to her illness. Dkt. #29-2, p. 43.

41.     Dr. Castiglia submitted an Attending Physician's Statement dated April 25, 2022, listing Nabi's diagnoses of GBM, Communicating Hydrocephalus, and Malignant Neoplasm of the Brain. Dkt. #29-2, pp. 88-90. Dr. Castiglia stated that Nabi had undergone surgery on August 20, 2020, for the insertion of a right ventriculoperitoneal shunt, and listed physical restrictions beginning on that date. *Id.* He also stated that he had first seen her for that condition on August 5, 2020, and that he had not advised her to stop working. *Id.*

42.     By fax on June 14, 2022, Dr. Castiglia submitted a revised statement stating that the date of Nabi's first visit for her condition was August 22, 2003, and that he had advised her to stop working in December 2009. Dkt. #29-2, p. 481.

43.     On April 29, 2022, Unum Benefit Specialist Courtney Holcomb ("Holcomb") called Nabi to discuss her claim. Dkt. #29-2, p. 93. Nabi stated that her last day worked was January 1, 2004 and that was the claimed date of disability. Holcomb asked Nabi why she had not filed a claim sooner, and Nabi stated that "she just forgot about the insurance" and her "husband reminded her." Dkt. #29-2, p. 94.

44.      Holcomb reviewed Nabi's treatment history, and Nabi stated that she could not remember all the dates. *Id.* Nabi also stated that she was "pretty much homebound," and that she was incapacitated; in a wheelchair; unable to stand, walk, or keep her balance; had loss of memory and hearing; was incontinent; could not sit too long; and could not drive. *Id.*

45.     Holcomb noted in her report of this call:

> [Nabi] sounded very tired throughout the call and talked softly and slowly. She asked me to repeat myself numerous times and to talk slowly. [She] seemed to have a hard time answering my questions. When she did provide answers, they were very brief and not detailed and it seemed like she could not recall much during our call. The call was kept very brief as it seemed like [Nabi] was having a progressively harder time as the call went on.

Dkt. #29-2, p. 95.

~ 12 ~

46.     On May 3, 2022, Nabi completed a form that Unum had sent to ENT for information regarding Nabi's employment. Dkt. #29-2, pp. 181-182. Nabi wrote that she had been hired on July 1, 1978 and that she had worked full-time until September 2008 and part-time until December 2009. Dkt. #29-2, p. 181.

47.     On May 4, 2022, in Unum's internal discussion forum regarding Nabi's claim, the assigned Vocational Representative, Robert J. Rodecker, stated: "The [employee's] diagnosis is Glioblastoma. *We need to determine if it was not reasonably possible for [her] to provide us with more timely notice of claim*." Dkt. #29-2, p. 175 (emphasis added).

48.     On May 5, 2022, Holcomb again called Nabi and left a voicemail, which she summarized in her notes:

> I left a voicemail message for [Nabi] advising I was first calling to confirm receipt of the employment questionnaire she completed. We were requesting it from the practice to obtain independent verification and we were hoping the office manager that took over from her may be able to complete it or someone else in the office so that it would be independent. Advised we did also have some other questions for her to help clarify some things and she seemed to have some difficulty recalling some details when we talked last week so I was wondering if maybe her husband could be on the phone when she called back to help answer questions if needed. Or if she feels she can answer, just her is fine too. Whichever she is more comfortable with.

Dkt. #29-2, p. 183.

49.     That same day, Holcomb sent Nabi a letter summarizing the evidence that had been submitted in support of her claim and stating that "we are unable to make a decision without additional time and information." Dkt. #29-2, pp. 185-187. Holcomb also noted the delayed notice of Nabi's claim and requested that Nabi provide an explanation as to why she did not file a claim sooner. Dkt. #29-2, p. 187. Holcomb also asked for additional information, including Nabi's care needs, whether she had been able to drive, and whether she had a power of attorney. *Id.*

50.     On May 20, 2022, Nabi responded to Holcomb's letter. Dkt. #29-2, pp. 197-198. She explained that when she was diagnosed with GBM in 2003, she was told she had only 9-12 months to live and her "mind at that time was not thinking of applying for disability insurance," she was "just thinking of survival." *Id.* She further advised Unum of her four brain surgeries following her diagnosis; extensive chemotherapy and radiation; radiation-caused necrosis which required removal of her right temple bone; loss of balance which caused falls and fractures requiring surgery; incontinence; and severe cognitive disability, memory loss and seizures. *Id.* She also advised that her husband takes care of her and is her power of attorney. *Id.* Finally, she stated that she did not work or drive after 2009, and that her husband helped her prepare the letter due to her memory loss. *Id.*

51.     A few days later, ENT submitted a response to Unum's questionnaire about Nabi's employment, completed by the then-current Office Manager, stating that Nabi's date last worked was December 30, 2009. Dkt. #29-2, pp. 210-211.

52.     On May 27, 2022, Unum employee Mark Chavez ("Chavez") sought legal advice via the internal forum. Dkt. #29-4, p. 214. Chavez stated "{l]ate notice claim has been filed with onset date of 2003 due to glioblastoma," and that "[s]ince NY is a strict late notice state, we intend to deny the earlier period of time" because Nabi "does not lay out any significant reasons why she could not have filed a claim earlier." *Id.* Chavez also noted that Nabi had reached the age of 65 in 2017, and he inquired whether Unum could assert that the policy terminated at that time. *Id.*

53.     On May 31, 2022, in-house counsel Daniel Flynn ("Flynn") responded that if, when Nabi turned 65, she was not working due to total disability, then the policy would have renewed, and "it would be appropriate to consider benefits from the date of notice and for a maximum benefit period of 24 months per the policy schedule and the claimant's age." Dkt. #29-4, pp. 214-215.

54.     On May 31, 2022, in the same forum, Holcomb stated:

> Both [Nabi] and [ENT] have confirmed that [Nabi] continued working in some capacity through December 2009. Since she was able to continue working through 2009, it appears that she could have notified us of her disability and provided proof of loss earlier than she did. She was not legally incapacitated or otherwise unable to provide us with notice of claim as required by the policy. Based on this, it appears reasonable to evaluate the claim using a beginning date of 09/08/2021, which is when [she] provided notice of claim.

Dkt. #29-2, p. 219.

55.     Holcomb also stated that, due to the question of whether Nabi was not working due to total disability when she turned 65, Unum was requesting medical records from Nabi's doctors "from 2016-present." Dkt. #29-2, pp. 219-220.

56.     On June 2, 2022, Holcomb sent Nabi a letter informing her that Unum would not consider her claim earlier than September 8, 2021. Dkt. #29-2, pp. 223-227. The letter also stated: "Since you were able to continue working through 2009, it appears you could have notified us of your disability and provided proof of loss earlier than you did. You were not legally incapacitated or otherwise unable to provide us with notice of claim as required by the policy." Dkt. #29-2, p. 225. Holcomb also noted that Unum would evaluate Nabi's medical records to determine if she was totally disabled when she turned 65 such that the policy was eligible for renewal. *Id.*

57.     On June 15, 2022, Nabi's husband, Dr. Sayeed Nabi, wrote a letter to Holcomb stating that her June 2 letter was "absurd" and that Nabi had undergone "several surgeries and treatments rendering her mental health and cognitive functions depleted." Dkt. #29-2, p. 488. He further stated that Nabi "became totally disabled as of December 2009 and not since September 2021," which was "well documented in the medical records." *Id.*

58.     On June 21, 2022, Unum sent Nabi a letter acknowledging her husband's letter as an appeal and stating that it had been assigned to Melissa Walsh ("Walsh"), Unum's Lead Appeals Specialist, for review. Dkt. #29-2, p. 495.

~ 16 ~

59.    On June 24, 2022, Unum's claims reviewer, Matthew Roop ("Roop"), contacted Flynn:

> While we understand late notice is significant and NY is a strict late notice state, **_looking for legal advice or case law if an insured had cognitive impairment or a disability that could have rendered her unable to file sooner. Claims manual does site [sic] that we have to determine if the late notice was reasonable, factoring in the nature of the medical condition_**.

Dkt. #29-4, p. 3 (emphasis added). Roop also noted that "[n]o medical review has been performed on the file to date." *Id.*

60.    On June 27, 2022, Flynn responded that unless Nabi "lacked the legal capacity to give notice of claim," then the late notice should not be excused. Dkt. #29-4, p. 4. He also noted that "it does not appear that a guardian or conservator had been appointed, or that claimant otherwise has been deemed mentally incompetent by relevant judicial authority." *Id.* He recommended that Unum obtain "more information about the insured's capacity over the last 18 years to determine whether she had the capacity to give notice of her claim" and determine whether her medical records show that she was "mentally incompetent." *Id.*

61.    On June 29, 2022, Walsh sent Nabi a letter regarding the appeal based on the letter to Unum from Nabi's husband. Dkt. #29-2, p. 499. Walsh asked: "Has there been a guardianship, conservatorship or other declaration regarding your mental capacity?" *Id.* Walsh also asked if Nabi could provide medical records or other information documenting

Nabi's mental capacity from 2009 to the present, noting that Unum had only received records going back to 2016/2018. *Id.*

62.    On July 8, 2022, Walsh spoke with Nabi's husband by telephone. Dkt. #29-2, p. 629. While Walsh stated that Unum did not have Nabi's medical records prior to 2016, her husband insisted that they had been sent. *Id.* Nabi's husband stated that the reason Nabi did not file a claim sooner was "memory loss," and that while she worked from 2003 to 2009, she "made mistakes" and he had to tell her to stop working. *Id.*

63.    Walsh stated that if Dr. Nabi wanted to provide medical records "substantiating his claim that [Nabi] couldn't file sooner due to a memory issue" then Walsh would look at that. *Id.* Nabi's husband began raising his voice, and Walsh ended the call stating that it was not productive. *Id.*

64.    On July 20, 2022, Nabi's husband wrote a letter to Walsh following up on their telephone conversation. Dkt. #29-2, p. 650. He stated that he was Nabi's guardian and caretaker and had her power of attorney. *Id.* He further listed three hospitals and two doctors, stating: "You have the permission to contact the following agencies for any information regarding Angelika's health and care." *Id.* He added: "If Angelika's cognitive and memory [*sic*] was in place she would have applied for disability earlier without any doubt. Unfortunately she did not. She was fighting for her survival." *Id.*

65.    Dr. Judith Cohen ("Dr. Cohen") is a physician who is board-certified in family medicine. Dkt. #75, p. 96. Since 2003, she has worked at Unum as a medical consultant.

Dkt. #75, p. 97. She is presently employed in Unum's appeals department. *Id.* Her responsibilities are to review a claimant's medical records in connection with a claim for benefits and to contact the claimant's attending physician with any questions. Dkt. #75, pp. 97-101.

66.     After reviewing Nabi's medical records, Dr. Cohen attempted to contact Dr. Castiglia on July 21 and 22, 2022, on which dates the office was closed or Dr. Castiglia was in surgery. Dkt. #29-2, p. 655; Dkt. #75, p. 103. On July 25, 2022, Dr. Cohen sent a letter to Dr. Castiglia regarding Nabi's medical records with questions. Dkt. #29-2, p. 705; Dkt. #75, p. 103.

67.     In the meantime, Dr. Castiglia returned Dr. Cohen's call later that same day. *Id.* Dr. Cohen summarized their conversation in a letter:

> I explained to you the purpose of my call and had noted I just sent you a letter. You explained to me Ms. Nabi has done miraculously well, and this is almost unheard of for this type of cancer, which is what is meant by "quite well." You noted she is suffering the effects from radiation treatment. A dementia has set in. [S]he also has significant weakness in her leg and is now wheelchair dependent. You placed a shunt in hope this would help with her cognitive decline. This has not happened. You noted the biggest decline has been in the past 3-5 years. ***She was forgetful prior, you feel, dating back to 2009, which is why you noted that date on the Attending Physician Statement.*** The decline for the past 3-5 years has resulted in her loss of any independence. ***In 2009 she was unable to work due to cognitive issues but was able to function at home***, which is not the case for the past 3-5 years. She has a son with special needs who she was able to [take] care of but no longer is able.
>
> She is not driving but you do not know when she stopped.

~ 19 ~

Dkt. #29-2, p. 661 (emphasis added); Dkt. #75, p. 106.

68.     Dr. Castiglia testified that when he told Dr. Cohen that Nabi was unable to work due to cognitive issues but "able to function at home," he meant that she did not have to go to a nursing facility where she would have assistance around the clock. Dkt. #75, pp. 94-95.

69.     Dr. Cohen testified that she found the information provided to her by Dr. Castiglia to be reliable and that she agreed with him. Dkt. #75, p. 126.

70.     Dr. Cohen noted in the Unum file that no further medical activity was necessary, and she testified that she was asked no further questions about Nabi's claim and had no further involvement with the claim until this litigation. Dkt. #75, p. 107.

71.     Meanwhile, Dr. Castiglia returned to Unum the first letter that Dr. Cohen had sent him on July 25, 2022, with his signature dated August 1, 2022. Dkt. #29-2, pp. 705-706. In response to Dr. Cohen's question "is my understanding of the records accurate that [Nabi] would not have been limited prior to the shunt in 2020," Dr. Castiglia checked "No." *Id.*

72.     In the following section, Dr. Castiglia wrote:

> Ms. Nabi has continued cognitive difficulties associated w/ radiation necrosis. There has been a steady decline in her ability to perform routine tasks such as driving and food preparation.

~ 20 ~

Dkt. #29-2, p. 706.

73.    Dr. Cohen testified that she was not asked by Unum to consider, as part of her review, what restrictions and limitations Nabi might have had in 2009, and she did not make any such evaluation. Dkt. #75, p. 107, 136. She was also not told to ask any questions regarding the timeliness of Nabi's notice of claim. *Id.* Further, she was not involved in the claim decision. Dkt. #75, p. 110.

74.    Unum's forum discussion regarding Nabi's claim, which included Unum benefits specialists as well as Dr. Cohen, indicated that they were inquiring into what restrictions and limitations Nabi had as of August 1, 2017, the date that Nabi's policy would have conditionally renewed. Dkt. #29-2, pp. 642-647; Dkt. #75, p. 120, 126.

75.    Unum thus requested Nabi's medical records from three providers—Dr. Castiglia, Dr. Mamnoon, and Dr. Mechtler—from January 1, 2016 to the present. Dkt. #29, pp. 260, 447, 612.

76.    Unum determined that, at the time Nabi turned 65, she was not working because she was "totally disabled" due to cognitive decline, and thus the policy had renewed. Dkt. #29-2, pp. 672, 677.

**<u>Unum Denies Nabi Disability Benefits Prior to September 8, 2021</u>**

77.    On July 27, 2022, Holcomb sent Nabi a letter stating that Unum had approved her claim for disability benefits beginning September 8, 2021, the date of her notice, for a period of 24 months per the policy terms. Dkt. #29-2, pp. 676-679.

78.    On August 1, 2022, Unum sent Nabi another letter stating that her appeal of the determined disability date of September 8, 2021 was denied. Dkt. #29-2, pp. 692-695. It stated, in part: "[I]t does not appear that a guardian or conservator had been appointed, or that you otherwise had been deemed mentally incompetent by relevant judicial authority." Dkt. #29-2, p. 693. The letter further stated that Unum was unable to obtain any of Nabi's medical records prior to approximately 2016. *Id.* While Unum acknowledged the July 20, 2022 letter from Nabi's husband granting Unum permission to obtain Nabi's "medical records from all hospitals, facilities and providers" that treated Nabi from 2003 forward, Unum stated: "We will not be requesting this information." Dkt. #29-2, p. 694. Rather, Unum stated that Nabi's husband would have to provide such records. *Id.*

79.    Nabi filed this action on August 16, 2023. Dkt. #1. She seeks compensatory benefits, prejudgment interest, and attorneys' fees and costs. *Id.*

**CONCLUSIONS OF LAW**

The following discussion constitutes the Court's conclusions of law in accord with Fed. R. Civ. P. 52(a)(1).

In an ERISA action, the plaintiff bears the burden of demonstrating an entitlement to benefits by a preponderance of the evidence. *Weiss v. Lincoln Nat'l Life Ins. Co.*, Case No. 2:24-cv-00591-cr, 2026 WL 483280, at *24 (D. Ver. Feb. 20, 2026) (citing *Pruter v. Loc. 210's Pension Tr. Fund*, 858 F.3d 753, 762 (2d Cir. 2017)); *Khan*, 386 F. Supp.3d at 272 (citations omitted).

### A.  Standard of Review

"[A] denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Delvalle v. Unum Grp. Corp.*, No. 22-CV-07717-LTS, 2026 WL 878595, at *4 (S.D.N.Y. Mar. 31, 2026) (citations and internal quotation marks omitted).

Here, the parties agree that the de novo standard of review applies. Dkt. #80, p. 33; Dkt. #81, p. 23.

"Under de novo review, the Court considers 'all aspects of the denial of an ERISA claim, including fact issues,' rather than deferring to the findings of the administrator." *Delvalle*, 2026 WL 8788585, at *4 (quoting *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999)). *See also Jarosz v. Am. Axle &*

*Mfg., Inc.*, 372 F. Supp.3d 163, 178 (W.D.N.Y. 2019) (on de novo review, the court "affords no deference to the insurer's interpretation of the plan documents, its analysis of the record, or its conclusions regarding the merits of the claim") (citation omitted), *amended*, 2019 WL 12239557 (W.D.N.Y. May 31, 2019). In other words, the court "stands in the shoes of the original decisionmaker." *Id.* (citation and internal quotation marks omitted).

### B.  Discussion

Based on the above factual findings, the Court concludes that, due to the cognitive effects of the treatments that Nabi underwent for her brain cancer, she was unable to give notice of her long-term disability claim at the time that she stopped working in December 2009. The Court also concludes that she gave notice "as soon as reasonably possible" after her husband discovered the policy in September 2021.

### *Late Notice*

First, Dr. Castiglia's testimony that he believed that plaintiff was cognitively unable to file an insurance claim after she quit working in 2009 is clear, credible, and unrebutted. Dr. Castiglia is an experienced neurosurgeon who has treated Nabi continuously since her brain cancer diagnosis in 2003. He thus has an up-close and long-term perspective regarding her condition, and he testified specifically that he observed a decline in Nabi's cognitive functioning in the years following her treatments. *See, e.g., Fichtl v. First Unum Life Ins. Co.*, Case No. 1:22-cv-06932 (JLR), 2024 WL 1300268, at *12 (S.D.N.Y. Mar. 26, 2024) (crediting opinions of plaintiff's treating physicians who had

treated him for years and thus had "a greater degree of understanding" of plaintiff's capabilities and limitations).

In contrast, Provident's witness, Dr. Cohen, testified that she was never asked by anyone at Provident to opine as to Nabi's cognitive status as of December 2009. Rather, she was asked to provide an opinion only as to whether Nabi met the definition of "total disability" as of August 1, 2017, the conditional renewal date of Nabi's policy.

The Court finds Dr. Cohen's testimony credible, and it is supported by the internal Provident documents showing that Provident made no inquiry into Nabi's cognitive status prior to 2017.

Provident's arguments in its proposed findings are unpersuasive. First, while Provident places great emphasis on the evidence that Nabi's cognitive decline was "progressive," Dr. Castiglia repeatedly testified—including on cross-examination—that he believed that *at the time she stopped working in 2009*, Nabi had suffered cognitive effects from treatment that rendered her unable to process the information necessary to make a claim under an insurance policy. That Nabi's cognitive decline continued to worsen after 2009 does not undermine this opinion.

Next, Provident asserts that Nabi's cognitive functioning must have been intact in 2009 because she gave informed consent for surgical procedures that Dr. Castiglia performed in 2013 and 2020. Dkt. #80, p. 29. However, as noted above, Dr.

~ 25 ~

Castiglia testified that Nabi relied heavily on her family during such discussions and that she and her husband conferred regarding the decision to proceed with those surgeries. This is not inconsistent with the conclusion that, by December 2009, Nabi's cognitive abilities had been impaired to the degree to which Dr. Castiglia testified.

Provident also cites case law for the proposition that lack of knowledge that an insurance policy existed, or forgetting that it existed, is not a valid reason for late notice. Dkt. #80, p. 36-37. The cited cases are inapposite, however. For example, in *Leonzo v. First Unum Life Ins. Co.*, No. 93 Civ. 0535 (KTD), 1994 WL 455203 (S.D.N.Y. Aug. 23, 1994), the plaintiff argued, unsuccessfully, that his late notice of claim should be excused because his employer never informed him that the policy existed. *Id.* at *2.

Here, Nabi obviously knew, prior to 2009, that the Provident policy existed because the administrative record contains a signed policy application that she completed in 1989. Dkt. #29-1, p. 32.

In addition, while Nabi stated that she had "forgot" about the insurance, it is clear from the record that her use of that word in 2022 does not carry the meaning it does in common parlance. Instead, the evidence shows that, by 2009, Nabi's cognitive functioning had become significantly impaired, and Unum does not dispute that it was only when Nabi's husband discovered the policy that Nabi filed a claim with his assistance. The full record thus supports the conclusion that Nabi's inability to remember the policy, recognize that she could file a claim after she stopped working in December

~ 26 ~

2009, and take the necessary steps to do so was not a garden-variety memory lapse but rather the physiological result of the radiation and chemotherapy that she had undergone.

Provident also asserts that the "undisputed" evidence demonstrates that Nabi continued to drive until 2020. Dkt. #80, p. 42. This is not true.

First, Nabi advised Provident at the time she filed her claim that she could not drive, Dkt. #29-2, pp. 49, 94, and in her letter of May 20, 2022, Nabi told Provident that she stopped driving in 2009. Dkt. #29-2, p. 198.

As for the office notes that state that Nabi was driving in 2016, 2017, 2019, and 2020, Dr. Castiglia's testimony effectively called into question the reliability of those entries. In particular, Dr. Mechtler's note of July 28, 2020 stating that Nabi was still driving is highly suspect given Dr. Castiglia's testimony that when he saw Nabi on August 5, 2020—approximately one week later—she was confused, in a wheelchair, unable to stand without assistance, and unable to ambulate. Dkt. #29-2, pp. 231, 524.

Furthermore, Provident's reliance on these records is quizzical given that it determined during the claims process that, as of August 1, 2017, plaintiff was not working because she was "totally disabled" due to cognitive decline. Yet, Provident now points to medical records of treatment after that date to argue that they reflect that Nabi had intact cognitive and executive function.

~ 27 ~

Provident also devotes a substantial portion of its proposed conclusions to the argument that Nabi "refused" to submit medical records to demonstrate that her cognitive impairment made her unable to file a claim earlier than she did. Dkt. #80, pp. 38-41. This is a red herring.

On de novo review, the only issue now before the Court is whether plaintiff has proved by a preponderance of the evidence that she filed her claim for benefits "as soon as reasonably possible." What records Provident did or did not have, and who bore the burden of obtaining those records, is irrelevant to that question.[5]

Provident's efforts to detract from Dr. Castiglia's credibility are also unavailing. Provident states in its proposed conclusions: "Nor does Dr. Castiglia have any explanation why it then became possible for Plaintiff to provide notice of claim in September 2021 and proof of loss in 2022, when, according to him, her cognitive abilities were worse than they had been in December 2009." Dkt. #80, p. 42.

This is a straw man argument because the explanation to this question is not within Dr. Castiglia's province but, instead, is found elsewhere in the record. That is, the evidence shows, and Provident points to nothing to the contrary, that plaintiff was able to file a claim in 2021 only because her husband discovered the policy; he assisted in

---

[5] The Court does find this argument strange, however, given that Unum required plaintiff to sign an authorization so that it could obtain the records from Dr. Castiglia, Dr. Mechtler, and Dr. Mamnoon from January 1, 2016 forward. The argument also appears to be at odds with the recommendation of Unum's in-house counsel on June 27, 2022, that Unum should "obtain[ ] more information about the insured's capacity **over the last eighteen years** to determine whether she had the capacity to give notice of her claim. "Dkt. #29-2, pp. 496-497 (emphasis added).

helping her to file the claim as well as the proof of loss letter; and he advocated on her behalf during the claims process.

In addition, during the bench trial, defense counsel pointed out that, aside from pre-operative appointments and surgeries, since 2003 Dr. Castiglia has seen Nabi only twice a year on average. Dkt. #75, p. 44. This does not undermine the persuasiveness of Dr. Castiglia's opinions. *See Fichtl*, 2024 WL 1300268, at *13 (rejecting attack on treating physician's opinion because he only personally examined plaintiff four times in two years; "Dr. Saal's four in-person examinations of Plaintiff, of course, were four more than those performed by all of Defendant's file reviewers put together.").

Equally unavailing is Provident's focus on Dr. Castiglia's statement to Dr. Cohen on July 25, 2022, that plaintiff was unable to work in 2009 due to cognitive issues but "was able to function at home." Dkt. #75, pp. 61-62. In addition to Dr. Castiglia's explanation of this statement on re-direct, it is well established under ERISA caselaw involving long-term disability claims that a plaintiff's ability to perform "rudimentary activities" of daily life does not "meaningfully correlate" with the relevant requirements of his or her vocation. *Fichtl*, 2024 WL 1300268, at *15 (collecting cases).[6] Under the same reasoning, an ability to "function" at home seems a low bar that sheds little light, if any, on the person's cognitive status.

---

[6] Provident also asserts that the contention that Nabi's husband was unaware of the insurance policy is "unpersuasive" because it was his medical practice that purchased the policy. Dkt. #80, p. 44, n.8. This is irrelevant. Plaintiff's husband is not the claimant, Nabi is, and it is thus her ability to give notice that is at issue.

### Proof of Loss

Provident next argues that Nabi is not entitled to benefits because she failed to file a timely proof of loss. Dkt. #80, pp. 44-47.

It is well established that "a plan administrator undermines ERISA and its implementing regulations when it presents a new rationale to the district court that was not presented to the claimant as a specific reason for denying benefits during the administrative process." *Collier v. Lincoln Life Assurance Co. of Boston*, 53 F.4th 1180, 1186 (9th Cir. 2022) (citations omitted). *See also Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) ("The reason for this rule is apparent[:] we will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation.") (citation and internal quotation marks omitted); *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 128 (1st Cir. 2004) (ERISA regulations require plan administrator to provide claimant with specific reasons for denial of claim, and insurer may not "hold that basis in reserve" until litigation); *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998) ("[W]e are free to ignore ERISA plan interpretations that did not actually furnish the basis for a plan administrator's benefits decision.") (citation omitted); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 696 (7th Cir. 1992) ("A *post hoc* attempt to furnish a rationale for a denial of . . . benefits in order to avoid reversal on appeal, and thus meaningful review, is not acceptable.") (citation and internal quotation marks omitted); *Berg v. Unum Life Ins. Co. of Am.*, 2:21-CV-11737-TGB-DRG, 2023 WL

2619015, at *8 (E.D. Mich. Mar. 23, 2023) (noting that courts "have unanimously rejected attempts to raise new reasons for denial once litigation has begun") (collecting cases).

In Unum's initial denial letter to Nabi, dated June 2, 2022, it referenced both the notice of claim and proof of loss provisions of the policy, but it concluded by stating: "Therefore, we will evaluate your disability claim using a beginning date of September 08, 2021, *which is when you provided notice of claim*." Dkt. #29-2, p. 225.

Any doubt as to whether Unum relied on untimely proof of loss as a basis for denying Nabi's claim prior to an onset date of September 8, 2021 is dispelled by its letter denying her appeal. Dkt. #29-2, pp. 692-696. Under "Initial Claim Decision," Unum stated:

> On June 2, 2022, you were advised that the earliest date of disability that could be used was September 8, 2021. **This was based upon the Notice of Claim provision of your policy.** Benefits would not be considered prior to such date.

Dkt. #29-2, p. 692 (emphasis added). In the following explanation, Unum stated: "Unless it was not reasonably possible for you to notify us of your claim timely, *we will adhere to the provision of your policy regarding written notice of claim*." Dkt. #29-2, p. 693. Finally, under "Policy Provisions that Apply to the Appeal Decision," Unum set forth only the text of the "Notice of Claim" provision. Dkt. #29-2, p. 694.

As explained in the above authorities, letters such as Unum's are mandated by ERISA regulations which require the plan administrator to set forth the specific reasons

for denying a claim during the administrative process, and reasons not specifically identified may not be relied upon once litigation ensues.

The Court thus concludes that Nabi's claim is not barred under the proof of loss provision of the policy.[7]

### Procedural Irregularities [8]

Unum also argues that any procedural irregularities in its administration of Nabi's claim do not support her timeliness position. Dkt. #80, pp. 48-49. Unum's argument is misplaced, however, because the Court relied on those facts at the dispositive motion stage for the sole purpose of determining whether good cause existed to admit the declaration of Dr. Castiglia. Dkt. #40, pp. 19-26. The Court includes those facts here only by way of background, and it has not relied on that evidence for purposes of these conclusions of law.

### Award of Benefits or Remand

An ERISA plaintiff is entitled to an award of benefits by the district court, as opposed to remand to the plan administrator, where "the difficulty is not that the administrative record was incomplete, but that a denial of benefits based on the record

---

[7] The Court also notes that even on summary judgment, while Provident invoked the policy's three-year limitations period, it did not argue for dismissal on the independent basis of the proof-of-loss provision. Dkt. #29, p.13; Dkt. #25-3, pp. 17-20.

[8] The Court will not address Provident's argument about the alleged incorrect standard of legal incompetence mentioned in its denial letters, Dkt. #80, pp. 47-48, as the Court does not rely on that evidence in reaching these conclusions.

was unreasonable." *Thoma v. Fox Long Term Disability Plan*, 17 Civ. 4389, 2018 WL 6514757, at \*29, n.4 (S.D.N.Y. Dec. 11, 2018) (citing *Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 648 (2d Cir. 2002)).

In cases cited by Provident in which remand was ordered, the courts concluded that the administrative record contained insufficient information to make the determination at issue. *See, e.g., Easter v. Cayuga Med. Ctr. At Ithaca Prepaid Health Plan*, 217 F. Supp.3d 608, 634 (N.D.N.Y. 2016). That is not the case here, and remand is thus inappropriate.

The Court thus concludes that Nabi is entitled to an award of benefits.

### Reasonable Attorneys' Fees, Costs, and Prejudgment Interest

"ERISA's fee shifting provision provides that the court in its discretion may allow a reasonable attorney's fee and costs . . . to either party. *Thoma*, 2018 WL 6514757, at \*29 (citation and internal quotation marks omitted). "It is well established that Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights." *Id.*

Whether "a plaintiff has obtained some degree of success on the merits is the sole factor that a court must consider in exercising its discretion to award attorneys' fees." *Id.*

Because Nabi has achieved success on the merits of her claim, she is entitled to her reasonable attorneys' fees and costs. *Id.*

Similarly, the decision to award prejudgment interest to a successful ERISA plaintiff is committed to the sound discretion of the court. *Id.* In making this determination, the court considers the following factors: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award; (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.*

Considering these factors, the Court concludes that Nabi is entitled to prejudgment interest to fully compensate her for the delay in receiving her benefits and because of the remedial purpose of ERISA. *See Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009) ("The central purpose of ERISA is to protect beneficiaries of employee benefits plans, . . . and private actions by beneficiaries seeking in good faith to secure their rights under employee benefit plans are important mechanisms for furthering ERISA's remedial purpose.") (citations and internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that**:**

(1) plaintiff is awarded long-term disability benefits under the disability policy at issue in this matter with a disability onset date of December 31, 2009; and

(2) the parties shall report to the Court in writing within 30 days regarding their efforts to reach consensus on: (1) the amount to which plaintiff is entitled in compensatory damages; (2) the amount of attorneys' fees and costs plaintiff seeks under 29 U.S.C. § 1132(g)(1); and (3) the rate at which prejudgment interest should be calculated.

**SO ORDERED.**

DATED:    Buffalo, New York
          April 27, 2026

        **s/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**